241688 Larry Smith v. Wayne County MI et al. Arguments not to exceed 15 minutes per side. Mr. Adams for appellant. Good morning Mr. Adams. I understand you've saved five minutes for rebuttal. Is that accurate? I have your honor. Okay, you may proceed. May it please this honorable court. The district court erred when it decided that the county was entitled to summary judgment on the grounds that Mr. Smith had waived his Monell claim against the county by accepting a settlement against the state of Michigan under the Wrongful Imprisonment Compensation Act. The district court further erred when it erroneously decided that Donaldson was entitled to summary judgment on the grounds of absolute immunity by classifying all of Donaldson's conduct as witness preparation during the criminal proceedings against Mr. Smith. And I'll start there. What Donaldson did in this case leading up to trial was not witness prep. It was not advocating. Donaldson became the lead investigator in the case and he created a witness. I'm just a little confused as to the facts because I thought, and tell me if I'm wrong, I thought what happens is at least in some version Culpepper is involved, meets with Allen I think or someone and gets Allen to agree to testify. Then he contacts Childs and then four days before trial Donaldson meets with Allen for the first time. Tell me if I'm mistaken just on the timeline at least. We've had a struggle with putting in place everything with paper because conveniently the county destroyed all of its records of all murder cases going back two decades around this time. So what we understand from what Edward Allen says in his testifying, he was approached by an attorney named Culpepper. Culpepper was the co-defendant of Mr. Smith. You mean Clay was the co-defendant? Clay was the co-defendant of Mr. Smith represented by Culpepper. Do you know, I mean I assume, I don't know if Culpepper is even alive. Did you try to reach out and find out? We did, your honor, and to our understanding Culpepper is no longer with us, your honor. The timeline that your honor points to is extremely important as well because during this time Culpepper has identified that his client was actually delivering papers at this time and that is the reason why his vehicle was seen in that area. An unshakable alibi was a lady who was receiving the paper at the time the shots were being fired on the next block. So they then dismissed all the charges against Mr. Smith. There's a period of time that passes where the case is completely stagnant and the reason why it's stagnant is because they got it wrong, your honor. They got it wrong in this investigation. So at some point we don't know exactly when or how because again the records aren't here. At some point Monica Childs and Edward Allen and also Donaldson are in a room together and this isn't a witness who is saying that they saw something or they heard something at the time. This is a witness that they are creating to put together a case that they should have did further investigation on and they would have found out the guy who killed this man was the person who threatened the victim literally weeks before. This was not Donaldson making an avocation at all and we have proof of that. I am sorry to interrupt you but is it accurate that the first time he interacts with Allen from the record is four days before trial? Your honor we argue that that is not accurate and we do not understand why the defendant's counsel is pointing to things without pointing to anything. They are interpreting this is what happened based on what we have. In our interpretation of it and as the court knows that the plaintiff's version should be construed in the plaintiff's favor, the memo comes down to an officer at DPD. The memo says Donaldson says go and get the statement and get it to me ASAP. This was literally days before the trial. Is that to Childs or is it someone else? It's to another officer. So the record really supports the version that we are arguing is that Donaldson and Childs met with this witness because how else would Donaldson know what this witness had to offer or if this was a witness. Did you depose Donaldson or Childs? We deposed both Donaldson and both Childs and your honor the reason why you don't see any sight to them by the defendants or by us is because they conveniently just don't remember anything. What about Hanahan the guy who wrote the memo? Did you depose him? We deposed Hanahan. Hanahan says he remembers the only thing that he remembers is that he was instructed by Donaldson to go and go get this statement. He said he was not the lead investigator. Everyone started to point the finger. Whenever we deposed anyone in this case without the records that conveniently walked away everyone pointed the finger at everyone. So we have to go off what the record says. The memo from Hanahan is dated November 14, 1994. Yes. When was the trial? The trial was literally within a week of that your honor. So I want to say the trial was somewhere around the 20th. Hanahan testified that he got instructions from Donaldson after he sent this memo. Yes. In that 10 day period. Yes. To go and meet with Allen. His instructions to Hanahan was to go and get the statement. He just instructed him to go and get the statement. So that means that Donaldson had full knowledge about. Is there any testimony from Hanahan that Donaldson told Hanahan what needed to go in the statement? There is no testimony of that from Hanahan. Hanahan as well has convenient amnesia when it comes to this point. Is it that normal prosecutor activity to ask an investigator to get a statement from a witness? Yes, it's normal your honor. But it's not normal when you take into context that the witness, Edward Allen, is saying that he never knew or saw Larry Smith. So Donaldson then gives him a picture and said here's Larry Smith. He then tells Donaldson I don't know what to say. He says all you have to say is that he confessed a murder to you. That's more than advocating or prepping a witness. You are creating a witness. And although we don't have black and white proof that Donaldson and Childs met before the instruction to go get the statement, when you think about the statement and you think about the facts of the case that I just argued your honor, he's doing nothing more but covering his tracks. He is sending out a message to a different officer to go get a statement. Here's the problem. You tell me, and it's similar to your frustration, but unfortunately the consequences for you seem to be starker, which is if you have to point to things in the record, and I agree with you, the record is, however you want to say it, conveniently devoid of any materials. But for us, so this line, there's this hard line, it's the one we're all talking around, which is, is the prosecutor engaged in prosecution? Is he engaged in trial tactics, getting ready for trial, all those things? Or is he engaged in investigation? And the way, this is what I'm struggling with, is the way I understand the facts from the record, is Allen meets with Culpepper, Allen meets with Childs, it's reported to the prosecutor, and then the prosecutor meets with the person four days before trial. That's why I keep coming back to that. Yes, your honor, I understand that. But that's not what happened here. This is what we can tell from the record. Okay, and tell me where I find it if you can. Yes, I can. Your honor, all of the record really comes from the deposition testimony of Edward Allen. So Edward Allen, he is having a problem as well. This is a 30-year-old murder. He's having a problem as well when it comes to the exact... It is, your honor, granted it is. And the funny thing is, that's exactly how he was when they fixed this statement to wrongfully convict Mr. Smith. So we were stuck with the person that was created in this case. When we look at the record and what Edward Allen is saying, and we also look at the memo itself instructing him to get this, your honor, this was a case that was falling apart. It did fall apart. So there's no way that he is deciding to call a witness at the last minute that he's going to prep, four days before, without knowing what exactly he's going to say. He's telling the police to go get the statement that he created so that way he can go in and cover his tracks. That's what the record suggests, your honor. When we look at this, and again, when we deposed Donaldson, we asked Donaldson specific things about the memo. The only thing he could point out or remember was that his actual home phone number was on the memo. Because he had gave the officers his home phone number, that his home phone number still existed today. This is not a prosecutor who is engaging in the preparation of a witness. He is creating a witness and he is now leading the investigation because a 17-year-old, weeks away from graduating, with no gang or gun, drugs background at all, was not the person who committed this crime. So he needed to spit and glue and fix this case. And he didn't do it in the advocation of the people. He didn't do it in the prepping of a witness. He created a witness and he covered his tracks. And with that, your honor, I will reserve my five minutes. I see I'm running out of time, unless your honors have any other... I actually have one, and you're not going to lose your time until that red light goes off. On your Monell claim, I'd just like to give you a chance to speak to this Layman case that we have from Ohio that seems to me to be pretty difficult for you. So I'd just like to give you a chance to talk. It is. It's a difficult case, your honor. But we believe that the law says that any waiver has to be knowing. At the time that Mr. Smith was accepting this WICA, we had already begun a litigation in this case with the claims of the Monell against the prosecutor's office for what we found through investigation were a number of cases that convictions were obtained in this very fashion. So as we are proceeding through litigation, the attorney general reaches out to my office and he says, look, we want to negotiate a settlement of the WICA claim. So to that, we said, well, we're open to it. The language that we got from the attorney general's office was asking Mr. Smith to accept less than what he was entitled to. He was entitled to around one point five million. They offered him eight hundred and fifty thousand. And our reply to that offer was we'll agree to the eight hundred and fifty thousand. But we will not be waiving our Monell claim as a result. They then allowed to take out the portion of the cited to statute that says that he would waive his Monell claims if he accepted it. If if they would have returned and said to us, we have no intentions of letting you proceed with this lawsuit. If you accept this money, there's no way Mr. Smith would have did it. He would not have accepted it. And further. That further to deal with that paragraph nine of the agreement, which says it's that this that there exists no promise, inducement or agreement outside of the release and settlement agreement. Does I seem to be getting into that? I again, I refer back to the law as we know it on waiver. It has to be knowing Mr. Smith isn't engaging in this if he knows. And there's evidence that the AG's office understood what we are arguing, because after we agree and we enter the order, you specifically said to them, we're reserving our Monell claim. Absolutely. Why not get that in writing? Judge, we felt it was in writing because we removed the part of the statute out that referenced that he would be waiving his claims. And also to the point, because I know I am pressing on my time, judge, the AG's office gets this agreement from us. If anyone believed that they were no longer they were immune now as a part of this agreement, they would naturally take this agreement and motion out of the case and say, look, Mr. Smith agreed to this amount of money. He waived his claims. They did nothing. Your honor. They never mentioned or made this argument at all until it came to summary judgment. And then they cited an order that was that question for him. They waited 11 months, which is puzzling to me if they think it's that clear. But I'm still struggling with the provision. Judge Bush cited coupled with the fact that if you asked for that, shouldn't it? I mean, just kind of standard contract law. Once you have a writing, it has to be reduced to writing. It does, your honor. And like I said, I, I, I fully believe that the attorney general's office understood exactly what we were asking for. And we thought we did our best in this agreement to remove the waiving of Mr. Smith's Monell claim. It was much more valuable and we had way more proof. And if he had the opportunity to normally waive it, we wouldn't be making an argument. But he didn't. Okay. All right. You have your full five minutes. Thank you for answering our questions. Thank you, your honor. Good morning, your honors. Josephine DiLorenzo on behalf of defendants. And I apologize in advance if I lose my voice. I'm not sure what's going on. I've never had allergies and I drank as much water as I could. Welcome to Cincinnati. Can you start with the Monell? Because the one thing I just didn't understand is if it was so crystal clear why it took you all, I think, 11 months to exert the Monell claim. Correct. There is nothing in the record as to why it took so long. So my assessment is that there were other issues in the case as to Mr. Donaldson. And then also all of these district court decisions from the Eastern District are relatively recent. So they might have not understood the full impact. The layman was on the books. It's an en banc decision of our court from 1987. Oh, correct. But this is specifically addressing the Michigan statute, I guess. But it's the equivalent Ohio statute. I mean, I don't know. A lawyer would look at that and say, boy, this is really good for us. You would think. I guess I don't have any. I guess. Sorry. Mr. Adams says that they specifically asked for an exception to the Monell claim. Do you know? Is that accurate? And why shouldn't I guess just I'm just thinking off the top of my head. It's like a contract. I don't know if the Monell claim has legs, but the it's like a contract. You're exerting a contract. He didn't because you brought it up at summary judgment. He never got an opportunity to at least get into the record that that was the case. And the AG specifically agreed to this. That we didn't put what in the record. He didn't get he said Mr. Adams says that when this was negotiated, he specifically accepted the Monell claim. He said, yes, we'll sign that. We'll agree to less by my calculation. He's right. Twenty seven years times. Fifty thousand is a lot more than eight hundred and fifty. In fact, we were batting around in chambers why you would take less. And it seems to me he now says, look, I did this because they gave me they let me pursue the Monell claim. Well, I don't know what the conversations were. I guess I would rely on the same thing. The language of the release says what it says. But isn't the AG a different. I'm sorry. I was probably going to ask the same question, which is if that's the point, that it wasn't brought up until summary judgment. And we have a fact dispute about whether there was an agreement to alter the standard language. That seems like a question, a fact question on which there should be record development. Well, I guess if something's in writing, I guess I don't know why it's a question of fact. There's also individual claims. So those are allowed to continue. So maybe. I mean, I don't want to speculate. I guess that could be why he took less money. But the individual claims wouldn't be at least tell me where this language bars individual claims. I thought it specifically allows individual claims of the Michigan law. Yes, it does. I'm sorry. I meant that those were still viable. So that's a way to get more. But why would you do that? I mean, I take the full I can get and I can still pursue the individual claims. The only thing he was getting, it seems to me, out of this is the Monell claim. I mean, there is a logic to what he's saying. That's all I'm saying. And so I'm trying to understand that. How does the WICA procedure work? If he hadn't accepted the settlement, what would have happened at that point? If he hadn't accepted the settlement from the state? Yeah. I mean, does it proceed to trial or what happens? That's a good question that I don't know. I guess what I'm getting at was, I mean, was there some consideration in terms of the time he was getting the money sooner than he would have otherwise? Was there any risk that he would not have prevailed in the WICA proceeding? Well, I don't think so. He met the elements of the statute. Okay. So there's no dispute by the state that he would have met the, but been entitled to the compensation. Correct. And I represent the county, which I think was just an intervening defendant in that case. So I guess whatever information the state has, I wouldn't have. But you can't point to anything, any consideration here that he would have received for getting a lower amount? No, Your Honor. Okay. And that's fair. You don't represent the Attorney General since we don't have the AG in front of us. But okay. You can proceed to the other one. Sure. Was there any other questions on that part of it? I think that's all I had to say. Well, I mean, he's kind of looking at some... Are you relying on this Provision 9 as your basis for why he can't bring up this other evidence of that there was an agreement to carve out the Monell claim? I would rely on the contract language, Your Honor. Do you want me to go on to the other issue, Mr. Donaldson? That's all you've got? Okay. You actually all covered most of what I was going to say about the Mr. Donaldson issue. I would point there was... Let me ask, then. I guess I'm struggling, as I said to Mr. Adams, with the Donaldson issue in this regard. The evidence in the record, I'm just used to more. And so when I look, there's only, it seems to me, in front of what I could see Allen's testimony as to what went on. Is there anything else? I would also point to this court's prior order in Smith v. Brewer. And it's docket 17-1741. That was attached to our summary judgment motion. So it's record entry 103.5. So in that case, this court was addressing Mr. Smith's request to appeal the denial of his habeas petition. And the court explained that one piece of the newly discovered evidence was an affidavit from Mr. Allen, quote, stating that he had been solicited by the Detroit police detective in charge of Smith's case to testify falsely against Smith. And his affidavit to that effect is also in the record at 101-3. So I'm thinking that his testimony is rather consistent that his dealings were with the Detroit police. So whether it was the co-defendant and the co-defendant's attorney that came to him and he reached out to Monica Child, or I think, as he says in this affidavit, that she reached out to him, I think that's where it started. And so then, you know, again, we have this memo a week before a trial. And Mr. Donaldson is just saying, yes, go ahead and get his statement. And then even if we have to believe his additional testimony that Mr. Donaldson then was, I guess, present for the statement and showing him a photo and telling him what to say, that's still preparing a witness for trial. It's still deciding that a witness can be used at trial, which this court has said before, this is advocacy. And so that's what I would say for that. Unless you have any questions. No. OK, thank you so much. Thank you.  Now, there's my pick back up where counsel left off. Yes, that'd be great. I want to be respectful when I say this, your honor. A person contacting the police or prosecutors is not uncommon when dealing with criminal cases. When a prosecutor is is interviewing a witness, he is doing just that. He's asking questions. He's prepping the witness. He is not creating a witness to an admission of guilt of a murder. When he's showing him a picture of Mr. Smith, who he says he's that he's never saw. If if if Donaldson would have went to meet with Alan and Alan would have gave him whatever far fetched version he wanted to give him that he even believed probably wasn't the truth, then that would be prepping, but not showing him a picture of a person I doesn't know. Can I ask you about Spurlock? Because that seems to be what you're getting at. And doesn't that bind us as I mean, it's it's a troubling prep is when you say it out loud, it's kind of troubling. But we did say in 2003 that a prosecutor's decision to have witnesses testify falsely at the defendant's criminal trial, even if done knowingly, is protected by absolute immunity. Yes, that's true. The difference here is that as in the Fifth Circuit found in the Third Circuit as well, as we argue that that Whitley says, but the witness was created. He wasn't a witness. He was created. So that's where I mean, your friend on the other side points out. There's this affidavit and the TEP deposition, both of which he says that at one point, I agree with you. He says a lot of things. He says Childs is the one he was dealing with. In fact, he said he was getting favors from Childs at one point, I think. And so the Third Circuit and Fifth Circuit cases, the prosecutors actually going out and getting a new witness, whereas here, at least there is record support that the witness existed. Does that make sense? And that if he's doing anything, you're right. He could be coaching this witness to testify, perhaps falsely, as we know he did ultimately. But then that's why I come back to the Spurlock case, which says, look, you know, the law is a bit troubling when you get to that far. But it's law we're stuck with as a panel of this court. It is, Your Honor. But again, we have to construe the facts that we have in favor of the plaintiff. And all amongst the things that Edward Allen had to say, the one he was consistent on was he met with Childs and Donaldson. He never alludes to, you know, meeting with with Childs by himself. He says something about a note goes over. He says he meets with Childs and Donaldson at the time that he meets with Childs and Donaldson. For example, Your Honor, we intend to argue at trial that whatever communication Allen sent over, when it was responded to, it was responded to with both Childs and also Donaldson. If Childs and Donaldson meet with Allen for the very first time and Allen is sitting there and he doesn't know anything and then Donaldson is giving him a picture of Mr. Mr. Smith, he's also telling him, oh, you just have to say that he confessed to the murder. He's not prepping him. He's creating him, Your Honor. And that's our argument. You don't get a license. And as I want to make sure that I say this before my time concludes, I believe that the district court struggled mightily with his decision. So much so that they quoted the I can quote the district court is saying this. If what Allen has to say is to be believed, this is criminal. And Donaldson, she loses bar license. However, because of the timing, we believe that he's entitled to absolute immunity. The district court made his ruling based on on post and pre indictment. They believe because the indictment had already taken place and that the trial was coming up. The conversation between Allen and Donaldson had to be merely just prepping. It was not. It was creation. If they had gotten to that room and Allen knew facts or alleged facts, then that's prepping. That's asking questions. That's evaluating a witness. That's doing due diligence. This was not this was a creation of a witness. And we argue that they met on the day that that he sent that note saying go get the statement because he wanted to cover his tracks. He knew he wasn't prepping. He was aware of the law, but he wanted to get a conviction. And we ask that you all overturn the district court's decision. And if you have any other questions in terms of the Monell, I most certainly will answer your honor. Yeah. I just want to ask one quick question. Do you know how the Wicca process works? I do, Your Honor. Yes. So if he hadn't accepted this settlement, what what would have happened? So there would have been a trial. There would have been a hearing, an actual trial. Right. But Mr. Smith had a conundrum, a very reasonable one. He is living on the couch of his mother, who is close to 90 years old. He doesn't have any clothes. He doesn't have any shoes. Nothing. Yes. So they they literally, Your Honor, they have created in our opinion, they have created a statute that is illegal. They are saying we will give you money. But if you get it, we'll give you money if you agree to waive any claim against us. But if you get money, you have to give us that money back. I mean, it sounds like to me, Tony Soprano authored that statute because it is so unfair. And the benefits that are only on the state of Michigan. And so this is why Mr. Smith told me, Mr. Adams, look, if I have to go and work at the car wash, I'm not accepting this. If I don't get my claim against the prosecutors because Donaldson did this to me. So we specifically argue this. And if there if anything, this should not have been sprung upon us. This should have been argued. So we could have developed a record to show what exactly happened. And that creates a factual dispute. He deserves to be back down at the district court for this. He settled the claim against Childs, right? He ends up settling the claim against Childs because, as I said before, Your Honor, we believe Childs was an integral part in this, but she wasn't the one that made this engine go. It was Donaldson. And we actually got to. We actually are honest to reverse. Anything further? OK, thank you very much. Thank you for your thoughtful argument. The case will be submitted.